**People of the State of Illinois, Plaintiff-Appellee, v. Samuel Lee Jackson, Defendant-Appellant.**

**Gen. No. 53,485.**

First District, Third Division.

November 6, 1969.

 

David C. Roston, of Chicago (Jenner & Block, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Daniel W. Weil, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court.

Samuel Jackson was found guilty by a jury of the sale and possession of narcotics. He was sentenced to life imprisonment for the sale and to a concurrent term of ten years to ten years and one day for the possession. Jackson had a prior conviction for a narcotics offense and the life imprisonment sentence imposed upon him was mandatory under Illinois law. Ill Rev Stats 1965, c 38, § 22–40.

Jackson sold heroin to John Genarella, a police informer, and Thomas Spanos, a police officer. They approached him in Genarella's automobile as he was walking along Madison Street, Chicago, at 10:00 p. m., December 27, 1965. Genarella and Jackson were acquainted, and after greeting each other Genarella told him that he and his friend each had $20 and wanted to purchase narcotics. Jackson entered the car, told them where to drive and asked for the money. Spanos gave him $40 in marked bills. After being driven to two places and absences of five and forty minutes, he returned with heroin. He got in the car, told Genarella to drive away and handed Spanos a tinfoil wrapper containing the heroin. He asked where they were going and Genarella replied to his apartment to use the drug and Jackson asked

to go along. Genarella drove to a prearranged place and parked the car. A police officer who was waiting approached and told Jackson he was under arrest. Jackson dropped a tinfoil package between his legs; it was recovered by the officer and identified as heroin. None of the marked bills were found on the defendant.

Jackson denied dropping any package in the car, but admitted selling the narcotics. His testimony in regard to the sale differed little from that of the State's witnesses, however he explained that he was an addict and had used narcotics since 1949, except for several periods of time serving sentences in the penitentiary. He said that he used heroin twice a day but had had none for three days prior to his arrest; that he was ill because of withdrawal, and that tears were welling in his eyes and he was dabbing them when Genarella and Spanos approached him. He testified that Genarella too looked as if he were ill and in need of narcotics; that, after first refusing, he agreed to obtain heroin for them when Genarella said he could share in it; that he bought the heroin for his own use and for Genarella's because of Genarella's illness.

The defendant raises a number of issues on appeal. His central theme is that, as a narcotics addict, he should not be convicted for acts which were impelled by that addiction. Tangential contentions are that the trial court erred in not accepting instructions which set up narcotics addiction as a legal defense to the charges of sale and possession of narcotics; that he was the victim of entrapment because the police induced his offenses by preying upon his need for narcotic drugs, and that the trial court erred in not giving the jury instructions which espoused this concept.

A further contention related to his addiction is that the State failed to prove that he was sane at the time the offenses were committed; that he was legally insane at that time because he was suffering from a mental de-

309

fect caused by withdrawal symptoms, which so overwhelmed him that he did not have substantial capacity to appreciate the criminality of his conduct and made him incapable of conforming his conduct to the requirements of the law.

It is also contended that certain trial errors were prejudicial, and that a sentence of life imprisonment for the sale of narcotics is cruel and unusual, in violation of the 8th and 14th Amendments of the Constitution of the United States and section 11 of Article II of the Constitution of Illinois.

The principal theory of Jackson's defense is based on the cases of Robinson v. California, 370 US 660 (1962), and People v. Davis, 27 Ill2d 57, 188 NE2d 225 (1963). In Robinson the defendant was convicted under a State statute making it a criminal offense for a person to be addicted to the use of narcotics. The reviewing court characterized the statute as one making the "status" of addiction a criminal offense whether or not the addict had been guilty of antisocial behavior. The court held that a state could not punish an addict who had not committed some state prohibited act without violating the 8th and 14th Amendments of the United States Constitution. In People v. Davis the Illinois Supreme Court followed Robinson and held invalid statutory provisions making it a criminal offense to be under the influence of, or be addicted to, the unlawful use of drugs.

The distinction between the status of addiction and the criminal acts of an addict was made clear in the cases of Powell v. Texas, 392 US 514 (1968), and People v. Nettles, 34 Ill2d 52, 213 NE2d 536 (1966), cert denied 386 US 1008 (1967). In Powell a chronic alcoholic was convicted of the offense of being drunk in a public place. The Supreme Court stated that the State of Texas had not punished a mere status, as California did in Robinson v. California, but had convicted the defendant, not for being a chronic alcoholic, but for being drunk in public

310

on a particular occasion. The court said that this was ". . . a far cry from convicting one for being an addict, being a chronic alcoholic, being 'mentally ill, or a leper . . .' " and added that "The entire thrust of Robinson . . . is that criminal penalties may be inflicted only if the accused has committed some act, has engaged in some behavior, which society has an interest in preventing. . . ." In People v. Nettles the defendant argued that the Illinois statute making possession of narcotics a criminal offense was unconstitutional when applied to a known narcotics addict. In rejecting this argument and upholding the statute, the court noted that Robinson v. California and People v. Davis ruled the statutes there in question invalid only insofar as they penalized the status or condition of addiction. The Powell and Nettles cases are controlling. Jackson is not being punished for being an addict; he was convicted and sentenced for the prohibited acts of selling and possessing narcotic drugs.

Our conclusion in reference to the defendant's principal theory disposes of the issue concerning the rejected instructions expounding that theory. To a lesser extent, it is also dispositive of the question of entrapment and the refused instruction on that subject—issues which were founded, in part, on the collateral theory that the defendant's addiction made the prospect of sharing in the narcotics so alluring that it was a compelling inducement to his conduct.

The contention that Jackson was entrapped as a matter of law is not tenable. The law of entrapment distinguishes between inducing a innocent man to do an unlawful act and merely affording him the opportunity or facility for committing the offense. People v. Gassaway, 65 Ill App2d 244, 212 NE2d 689 (1965). Bereft of the argument that his addiction created such an overwhelming craving for drugs that, as a matter of law, he was not responsible for his acts, the evidence disclosed

no more than the ordinary narcotics transaction arranged by law enforcement officials with the aid of informers. Although these transactions border on entrapment and many aspects of them are repugnant, they are approved by the courts as a necessary police procedure to suppress illegal traffic in narcotic drugs.

The evidence of the State showed that Jackson readily acceded to the request that he procure narcotics. When asked by Genarella to purchase heroin, he wanted to know how much money he had. He made no suggestion that the heroin be shared until after he had delivered it to Spanos. Jackson knew where narcotics could be obtained, and when one source failed he found another. This does not indicate that he was induced into selling narcotics, but rather that he was willing to do so and, when afforded the opportunity, did not hesitate to commit a crime. Further, the evidence would indicate that he profited from the transaction. He did not testify that he received no commission as the middleman in the deal, and the fact that he had an additional packet of heroin in his possession suggests that he received this in lieu of money. If he did not, the possession of his own packet weakens his testimony that the reason he sold heroin to Genarella and Spanos was because he needed to share in it to ease his withdrawal pains.

██ The instruction given by the court on the subject of entrapment correctly set forth the law in Illinois. The refused instruction attempted to relate the law to the testimony and the theory of the defendant. The court was under no obligation to give more than one instruction on entrapment, and since the given instruction adequately covered the law, was fair to both sides and enabled the jury to accept either the defendant's or the State's version of the transaction, the court did not err in refusing the second one. People v. Horton, 4 Ill2d 176, 122 NE2d 214 (1954); People v. Lockett, 85 Ill App2d 410, 229 NE2d 386 (1967).

312

Likewise, the court did not err in instructing the jury that the use of informers is a legitimate enforcement procedure. This instruction is criticized as being incomplete and as informing the jury that all use of informers is proper. The instruction must be read in conjunction with the State's instruction on entrapment which distinguished between the proper and improper use of informers. Particular instructions need not contain all the law on a given subject if the instructions as a whole fully and fairly cover the law. People v. Horton, 4 Ill2d 176, 122 NE2d 214 (1954).

The defendant argues that the State failed to prove beyond a reasonable doubt that he was sane at the time of the sale. A psychiatrist, who examined him for one and one-half hours nine months after the crime, testified that at the time of the offense Jackson was in a post-addiction stage and that, based upon his addiction and his need for narcotics, he did not have the capacity to resist a request that he purchase heroin for his own use and the use of others. The doctor's diagnosis was that Jackson had an emotionally unstable personality; that he used drugs as a tranquilizer and to bolster his feeling of inadequacy, and that his withdrawal symptoms amounted to a mental defect. The doctor concluded that he did not have substantial capacity to appreciate the criminality of his act or to conform his conduct to the requirements of the law. A psychiatrist for the State, who also examined Jackson nine months after the crime but for a shorter period of time, reached the opposite conclusion. He diagnosed the defendant as having a sociopathic personality disturbance, but he stated that a narcotics addict who had a personality disturbance and who had been without heroin for three days could appreciate the criminality of his conduct. The doctor conceded, however, that there could be situations in which a person addicted to heroin would be unable to resist the drug if it were made available to him.

313

A person is not criminally responsible for his conduct if at the time of the offense, as a result of a mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Ill Rev Stats 1965, c 38, § 6–2. When a defendant introduces evidence of insanity the State must prove him sane at the time of the offense beyond a reasonable doubt. The question is one of fact for the jury and the jury's verdict will not be disturbed on review unless it leaves a reasonable doubt of the defendant's responsibility or is so palpably against the weight of the evidence as to indicate that it was based on passion or prejudice. People v. Groves, 100 Ill App2d 171, 241 NE2d 622 (1968).

The evidence of the State was that the defendant's appearance gave no indication that he was suffering from withdrawal symptoms. This, plus the total evidence surrounding the sale, the things he did and said, his attempt to conceal his own possession of heroin when he was apprehended, and the testimony of the State's psychiatrist were sufficient to support the finding of sanity.

The defendant next contends that trial errors require reversal. The first of these was the refusal of the court to order a voir dire examination of Genarella under oath. Prior to the trial the defense attorneys were granted permission to speak to Genarella. When the State called him as its witness, the attorneys informed the court that he had refused to talk to them and requested a hearing. At this hearing, which was held outside the presence of the jury, Genarella was examined by both parties. Genarella said that he had been told by the State that he did not have to talk to the attorneys but that he had not been instructed to refuse to talk to them. The attorneys then moved for permission to

314

examine Genarella outside of the presence of the jury under oath on the facts of the case and this was denied.

 A defendant is entitled to a list of prosecution witnesses (Ill Rev Stats 1967, c 38, § 114–9), and he may contact these witnesses in the preparation of his case. The prosecuting attorney cannot direct witnesses not to speak to the defendant or his counsel or otherwise deprive them of a fair opportunity for an interview. However, witnesses are under no obligation to speak to the defense (People v. Mitchell, 16 Ill App2d 189, 147 NE2d 883 (1958)), and the prosecuting attorney may so inform them. Moreover, a trial court is without power, under these circmstances, to compel witnesses to answer questions. Ill Rev Stats 1965, c 38, § 114–13, provides that discovery procedures in criminal cases shall be in accordance with Supreme Court Rules. The Supreme Court has not adopted discovery rules in criminal cases, and a trial court may not act withcut such authorization. People v. Martin, 74 Ill App2d 431, 221 NE2d 13 (1966).

 The defendant's attorneys were afforded a fair opportunity to interview Genarella and were given a full hearing to determine if the State had acted improperly. The trial court was unable to do more, and correctly denied the defendant's request.

The second alleged trial error is of more merit. Genarella had been a police informer since 1959 and had testified for the police approximately 50 times. He received compensation for his assistance; in fact, the only employment he had during the entire year of 1964—just the year before his transaction with Jackson—was as a special employee of the police department. In addition to money, he got leniency from the police for his own criminal offenses. He testified that he had not used narcotics for 13 or 14 months prior to the trial, but that he had been an addict for 15 years and would lie to get narcotics. The defendant's attorneys wanted to show that he lied in

court in a 1959 narcotics case, was found guilty of contempt and sentenced to six months in the county jail. In that case he had falsely identified the accused who, it was discovered, had been in jail at the time of the alleged offense. The court admonished the attorneys not to refer to the 1959 case but permitted them to make an offer of proof, which they did by introducing the transcript of the contempt hearing. The ruling of the court seems to have been based on the ground that contempt of court is not a provable offense for the purpose of impeaching credibility. A witness' credibility may be attacked by showing that he has been convicted of a crime. Ill Rev Stats 1965, c 38, § 155–1. Infamous crimes are listed in section 124–1 of chapter 38 and perjury is one of them. But contempt of court for committing perjury is not a conviction for the crime of perjury and, from this limited point of view, the trial court properly restricted the cross-examination.

However, showing a witness' interest, motive or bias is a proper means of impeachment and the widest latitude in cross-examination is allowed for this purpose. People v. Mason, 28 Ill2d 396, 192 NE2d 835 (1963); People v. Rainford, 58 Ill App2d 312, 208 NE2d 314 (1965). If a witness has an interest in the outcome of the case on trial, this interest can be shown. If he has a personal interest in the outcome of cases of the same type as the one on trial, we see no reason why this interest cannot be shown. Genarella had a personal and continuing interest in the prosecution of all the narcotics cases in which he was a witness. The length to which this professional informer would go in order to secure a conviction and remain in the good graces of the police was a proper line of inquiry. His being held in contempt of court for testifying falsely in another narcotics case where he was the informer, would have revealed to the jury the depth of his motive as well as the fallibility of his identifications.

 Forbidding cross-examination on this subject is claimed to be prejudicial error. The ruling was erroneous but we do not find it prejudicial. Genarella testified that Jackson sold heroin to him and Spanos; Jackson admitted the sale. Genarella's testimony about the details of the sale was corroborated by Spanos and in many material respects by Jackson himself. Jackson's defense was that his narcotics addiction compelled the sale, that he was temporarily deranged because of not having narcotics for several days and that he was entrapped into making the sale by purchasers who took advantage of his withdrawal symptoms and obvious need for drugs. Genarella gave no testimony on these subjects. He was not questioned on either direct or cross-examination concerning Jackson's outward symptoms or physical appearance. Spanos testified that Jackson showed no signs of withdrawal; Genarella did not. And as to the charge of possessing narcotics, Genarella's testimony contributed little if anything to the State's case. Both he and Jackson were ordered out of the auto by the arresting officer; both were ordered to face the car and put their hands upon it. Genarella's view of what took place was restricted; he did not testify that Jackson dropped a tinfoil package to the floor of the car or that the officer recovered such a package. He said that he saw a police officer pick up something but he added, "I don't know what it was." Since Genarella's testimony as to the sale was corroborated by Spanos and Jackson himself, since it had no bearing on Jackson's addiction or sanity or craving for drugs, and since his testimony was of minor importance to the charge of possession, the damage to the defense by the prohibition of cross-examination was minimal.

It is further contended that the State committed reversible error in its closing argument. Again, we agree that error was committed but we do not find it reversible. During the closing argument the defendant's attorney in

discussing the verdict forms, said if the jury found Jackson not guilty by reason of insanity and that he had not recovered his sanity,

> "[He] will be sent to a psychiatric institution. He will be sent to a mental institution and will not be released from the mental institution until there is a further determination of his competency, a further Court hearing on that competency."

In his closing argument the prosecutor rejoined:

> "You heard Dr. Haines testify. He is the psychiatrist there. Within a week, the defendant will have a writ of habeas corpus out and Dr. Haines on the stand."

The court sustained an objection to the comment and ordered it stricken. The assistant State's attorney shortly thereafter said:

> "The only way you can cut this out [i. e. traffic in narcotics] is to get the people who would sell it. I wish we had Herbie [Officer Spanos testified that Jackson informed him he had purchased the heroin from 'Herbie'] here who got it for the defendant . . . . We don't have Herbie, but we have the defendant . . . . There can be no reasonable doubt in your minds after having heard this testimony and the evidence in this case that this defendant is guilty as charged. And any sympathy exercised in hoping that the man will be sent away and cured will be a waste of time because he will be out in a week."

The court overruled an objection that the reference to Herbie was not proper rebuttal argument but sustained the objection to the prosecutor's final comment.

During its deliberation the jury sent two questions to the trial judge. The first was:

318

"Your Honor, the question arises whether or not the defendant would receive the same kind of treatment in jail as in the hospital."

The second read:

"If found guilty would or could a plea of clemency be considered? Such as being sent to a sanitarium or hospital for a time determined by the Court or until such a time as the defendant is considered by said hospital that he is qualified to return to society and then only on probation, as an example?"

The court responded that any action subsequent to the jury's verdict would be determined by the law and by the court's decision.

It is the defendant's contention that the reference to Herbie was outside the scope of the defense argument; that the comments on the quick release of the defendant, if the jury found him not guilty by reason of insanity and that he was still insane, were prejudicial; and that the questions asked by the jury indicated that it was influenced by the State's argument.

 The reference to the person who supplied narcotics to Jackson was not improper. It was based on the evidence and fair inferences from the evidence and the defense was not harmed by being unable to reply. The propriety of arguing that a defendant will be discharged quickly and prematurely from a mental institution if found insane appears to be a new question in Illinois. Such comments have been held improper in some other states. See e. g., People v. Sorenson, 231 Cal App 2d 88, 41 Cal Rptr 657 (1964); State v. Johnson (Mo), 267 SW2d 642 (1954). In Illinois, an analogous argument that an accused if found guilty, may be granted probation rather than imprisoned, has been held prejudicial. People v. Burgard, 377 Ill 322, 36 NE2d 558 (1944). The

319

prosecutor was attempting to respond to the borderline remarks of the defense but in doing so he went too far. The defense argument did not open the door to speculation about the defendant's filing habeas corpus proceedings, that the State would not have adequate time to treat him, or that his confinement in a mental institution would only be of a week's duration. Improper argument, however, requires reversal only when it appears that substantial prejudice has occurred to the defendant. People v. Brooks, 52 Ill App2d 473, 202 NE2d 265 (1964). The questions asked by the jury do not show that they were prompted by a fear of the defendant's premature discharge. They could have been stimulated by the argument in behalf of the defendant as much as by the argument of the State. Although the prosecutor's comments should not have been made, they were minimized by the court's sustaining the objections to them, striking them from the record and instructing the jury to disregard them. Under all the facts and circumstances of this case it does not appear that the brief comments could have been a material factor in the verdict reached by the jury.

 Complaint is made of another phase of the prosecutor's argument. In commenting on the psychiatrist's testimony that Jackson took heroin as a tranquilizer, he said:

> "As to why he takes it, well, he wants it . . . . This man takes it as a tranquilizer but everybody else takes it for enjoyment. . . . This is a new test, ladies and gentlemen. A man who is sexually aroused and grabs a woman and rapes her. He is insane. He wanted a woman so he grabbed her and took her. . . ."

The court overruled an objection to this argument. The defendant reasons that the jurors were likely to surmise from this that he was a potential sex criminal. The com-

ment did not carry such an implication; it was directed to the defendant's voluntary action and it could not have misled the jury into thinking that he had or was likely to commit a sex crime. In its context it did not prejudice the defendant and was not improper.

Next to be considered is the defendant's argument that his sentence of life imprisonment is cruel and unusual in violation of the Federal Constitution, disproportionate to the nature of the offense in violation of the Illinois Constitution, and incompatible with the penalties for more serious offenses. The sentence was imposed under the statute (Ill Rev Stats 1965, c 38, § 22–40) which provided a sentence of ten years to life for the illegal sale of narcotics, and life imprisonment if the defendant has been convicted previously of an offense under the Illinois Uniform Narcotic Drug Act. Jackson had a prior conviction for possessing narcotics and the life sentence was mandatory. The same constitutional argument was rejected in People v. Gonzales, 25 Ill2d 235, 184 NE2d 833 (1962), cert denied 372 US 923 (1963), in reference to the minimum punishment of ten years for a first offender. The court stated:

> "It may be that there are more effective techniques for the control and elimination of the narcotics traffic than a solution that takes the form of penalties of increasing severity. . . . Nevertheless, having in mind the deadly toll that is exacted by the narcotics traffic, we cannot say that the penalty fixed in this case is 'disproportionate to the nature of the offense.' "

Illinois courts have upheld high penalties for a number of criminal offenses against constitutional attack. For murder, sentences of death and of imprisonment for 199 years have been sustained. People v. Chesnas, 325 Ill 361, 156 NE 372 (1927); People v. Pace, 362 Ill 224, 198 NE 319 (1935); People v. Grant, 385 Ill 61, 52 NE2d

261 (1943), cert denied 323 US 743 (1944). For rape, sentences of imprisonment for life, for 199 years and for 99 years have been upheld. People v. Mundro, 326 Ill 324, 157 NE 167 (1927); People v. Dixon, 400 Ill 449, 81 NE2d 257 (1948); People v. Fog, 385 Ill 389, 52 NE 2d 699 (1944), cert denied 327 US 811 (1945).

 The penalty for the sale of narcotics subsequent to a prior offense is severe. It is the highest statutory punishment in Illinois for a recidivist offender. But illegal distribution of narcotics is widespread. It has many evils. One of these—the resort to crime to obtain money to buy drugs—is graphically exposed in the present case. Genarella testified that during the 15 years of his addiction he spent from $5 to $20 a day for drugs. He frankly admitted that he obtained much of the money by stealing. Jackson testified that he spent from $20 to $30 a day for drugs. His criminal record included penitentiary sentences for attempted armed robbery and confidence game. One of the purposes of the statute is an attempt to stem collateral crimes by imposing severe penalties upon those who sell narcotics. This and the other laudable purposes of the statute should not be interfered with unless the punishment is "cruel," "degrading," or "so wholly disproportioned to the offense committed as to shock the moral sense of the community" (People ex rel. Bradley v. The Illinois State Reformatory, 148 Ill 413, 36 NE 76 (1894)) or "so disproportionate to the offense that it shocks the conscience of reasonable men" (People v. Landers, 329 Ill 453, 160 NE 836 (1928)). The statutory penalty is none of these; nor can it be said to be an unusual punishment or disproportionate to the nature of the offense.

The judgment is affirmed.

Affirmed.

SCHWARTZ and McNAMARA, JJ., concur.