People of the State of Illinois, Plaintiff-Appellee, v. Thomas A. Sauber, Defendant-Appellant.

Gen. No. 65–79.

Second District.

March 14, 1966.

Thomas O. Flack and Jay M. David, of Chicago, for appellant.

C. Robert Ohse, State's Attorney, of Yorkville, for appellee.

MR. JUSTICE DAVIS delivered the opinion of the court.

We granted the Petition For Leave to Appeal of defendant-appellant, wherein he sought to reverse the judgment of the Circuit Court of the 16th Judicial Circuit, Kendall County, entered upon the jury verdict finding him guilty of the crime of burglary. The defendant was sentenced by the court to serve not less than three nor more than five years in the penitentiary.

The defendant urges that the judgment be reversed because the court erred in certain evidentiary rulings and in denying his motion for a continuance; that defendant was denied his constitutional right to a fair trial by the denial of his motion for continuance and by the incompetency of his counsel due to ill health; and that the proof submitted was not sufficient to sustain the verdict of the jury.

Ten witnesses testified on behalf of the People on direct examination and one in rebuttal: one witness testified on behalf of the defendant. Donald K. Espeland, his wife, 16 year old son, and daughter, came to a tavern known as the "Shamrock" about 6:00 a. m., on February 16, 1964. Espeland was employed to clean the tavern on Sunday morning of each week. Snow had fallen the night before and it was not yet light when he parked his car at the east rear of the tavern, prior to entering the front door on its west side.

Upon opening the door, he saw two men in the tavern, who later ran out the back door. Espeland closed the door and something struck it, breaking the glass portion thereof. He called to his son to catch one of the men. His son pursued and ultimately caught the man—who was later identified as Fred Larsen.

The other man escaped in a white compact car parked 60 to 70 feet south of the Corral Restaurant, which is adjacent to and west of the Shamrock. This man, according to two witnesses, was about 5 feet, 7 or 8 inches tall, of medium build, and weighed about 150 to 160 pounds— the same height, weight and build as the defendant.

Two witnesses at the scene of the burglary saw the car; it passed one of them three times. This witness described the car as a '62 or '63 white Valiant. In making his getaway in the white car, the man drove across a vacant lot east of the Shamrock and turned north—through a deep depression—onto Route 34.

The Shamrock had been entered through a window next to the west door. The jukebox was smashed; the front was torn off the cigarette machine; the money-box had been pried from the pool table, and the cash register was damaged. Near the back door was a cardboard box packed with frozen meat, expensive whiskey and a portable radio. The cardboard box and the locks were bloodstained.

Fred Larsen—who was captured, subsequently convicted on a plea of guilty and sentenced for the crime of burglary—had known the defendant for ten years, and they had a sister-in-law in common, in Chicago. The defendant and Larsen drank together in an area tavern for about one and one-half hours the night before the burglary, having parted about 9:00 p. m. While in jail, Larsen told Sheriff Mundwiler that the man who was with him had a father-in-law in Millington, who had a business in Sandwich; and that the white car had been rented from the Econo Car Rental somewhere around Highland Park.

George Hoff testified that he operated the Econo Car Rental in Highland Park, and that on January 25, 1964, he rented a 1964 white Valiant car to the defendant, which was to be returned the next day. The car was recovered by Hoff on February 27, 1964, in a damaged condition, particularly the right front fender.

Sheriff Mundwiler talked with Larsen at the penitentiary and asked him if he would come back and testify. Larsen would not answer, but suggested then that Mundwiler get the other man's son, "Randy," who, he said, was with them at the time. The defendant had a nine-year-

old son named "Randy" who was in the white compact Valiant car which was damaged at the front and driven by defendant to the home of his father-in-law at Millington, a distance of about ten miles from the scene of the burglary, within an hour and a half after a man of similar size, weight and build fled from the scene of the burglary in such car.

Bernard C. Porter testified that he lived in Millington and had an accounting business in Sandwich; that the defendant was his son-in-law; that he saw the defendant at Millington between 7:40 and 8:00 a. m., on February 16, 1964; that the defendant was in a small white or grey car; that the bumper and front axle was full of mud and weeds; that defendant's son "Randy" was in the car; that one of defendant's hands was bandaged, and that defendant told Porter that he had hit a bridge and hurt his hand.

Joseph Schleuker, another son-in-law of Bernard C. Porter, testified that the defendant came to Porter's home in Millington at about 7:15 or 7:30 a. m., on February 16, 1964; that he was driving a white or cream-colored Chrysler, compact car; and that Schleuker filled the radiator, and the defendant told him there was a hole in it.

Marion Elaine Sauber, stepdaughter of Bernard C. Porter and divorced wife of the defendant, testified on his behalf. She stated that the defendant picked her up in a white compact car, after midnight on Sunday, February 16, 1964; that they went to his father's apartment and stayed there until about 4:30 a. m., at which time the defendant drove her back to the hotel where she worked, leaving her there at about 5:30 a. m.; and that the defendant had hurt his hand on the vent of the car window and had wrapped it in a handkerchief. However, on cross-examination, Mrs. Sauber testified that in a telephone conversation with her stepfather about 8:25 a. m.,

on February 16, 1964, she said she had not seen the defendant for two weeks.

■ In the direct examination, the State's Attorney asked Larsen if he first met the defendant in the penitentiary and Larsen answered, "No." After Larsen had so answered, counsel for defendant objected to the question on the basis that it implied that the defendant had been in the penitentiary. The court noted the objection and proceeded with the trial. The defendant urges that the court committed reversible error in permitting the State's Attorney to ask, and the witness to answer this question. We note that the defendant offered no objection to the question until after it was answered in the negative; that no motion was made to strike the answer; and that the court never ruled on the objection. The negative answer would indicate an inference that defendant had not previously been in the penitentiary. Consequently, we find no prejudicial error in the foregoing sequel of evidentiary procedures.

■■ Error is further urged by defendant in that the court permitted the People's witness, Sheriff Mundwiler, to testify concerning statements made by Fred Larsen out of the presence of the defendant—when Larsen was not under oath, or subject to cross-examination. However, this testimony now complained of was not elicited from the witness on direct examination by the State's Attorney, but rather was brought out by the attorney for the defendant on cross-examination, and he neither offered an objection thereto nor made any motion to strike it. The defendant, having asked for this information, cannot now object thereto (The People v. Villalobos, 20 Ill2d 315, 319, 169 NE2d 745 (1960) ; The People v. Henry, 3 Ill2d 609, 614, 122 NE2d 159 (1954)), and in addition, since no objection was made to the admission of such testimony in the trial court, objection thereto cannot be raised for the first time on review. The People v. Songer, 28 Ill2d 433, 436, 192 NE2d 861 (1963).

■ Defendant likewise contends that it was error to permit the People to cause Fred Larsen to be called as the court's witness. Larsen, a known eyewitness to the crime, had expressed a reluctance to testify against the defendant, and it was not contested that the People could not vouch for his testimony. The People believed and requested that he should be made the court's witness and subjected to cross-examination by both the defendant and the People.

The defendant's objection to the request that Larsen be called as the court's witness was:

> "I object to Mr. Larsen being called as a court witness on the grounds that without Larsen there is no case against Sauber. It goes to the essence of the proof of the statement of the charge against this defendant. Any litigant, putting a witness on the stand, vouches for his client and the truth he is going to testify to. By having him called as a court witness, he is in doubt. He, the State's attorney, is in doubt and, if he has any doubt, he should not have him on at all. I have nothing further to say."

In The People v. Robinson, 14 Ill2d 325, 153 NE2d 65 (1958), at pages 333 and 334, the court stated:

> "Since Carle v. People, 200 Ill 494, it has been the established law of this State that where the State's Attorney, for a sufficient reason shown to the court, doubts the integrity or veracity of a witness, he is not required to call him as a witness for the People and vouch for his testimony, but such witness may be made the court's witness and cross-examined by either side. (People v. Hundley, 4 Ill2d 244.) The purpose of this rule is to prevent a miscarriage of justice by having an eyewitness to a crime, for whose veracity neither party will vouch, fail to testify. (People v. Cardinelli, 297 Ill 116.)"

140

Under the law and the facts of this case, Larsen was properly called as the court's witness.

We find no error in the trial court's denial of defendant's motion for continuance. Counsel of defendant's choice appeared with the defendant in the circuit court on October 9, 1964, when defendant waived prosecution by indictment and consented to prosecution by information. On a plea of not guilty, the court set the case for jury trial on October 26, 1964. On that date, defendant's counsel filed a motion for continuance which was granted, and the case was then set for jury trial on November 16, 1964. At that time, the case came on for trial. After empanelling a jury, defendant's counsel again moved for a continuance, and the court granted in part and denied in part such motion, and continued the case for trial on November 18, 1964.

The matter of continuance is within the sound discretion of the trial judge, and it is only where the record shows an abuse of such discretion that the conviction will be reversed. The People v. Harper, 31 Ill2d 51, 57, 198 NE2d 825 (1964); The People v. Clark, 9 Ill 2d 46, 49, 137 NE2d 54 (1956). We find no abuse of discretion and find that the cases cited by defendant are readily distinguishable factually from the case at bar— a single defendant case—which was neither complicated nor embraced novel points of law. The time elapsing between plea and trial was adequate for the preparation of this case. We also take judicial notice of the fact that Kendall County is small, and that petit juries are called in such counties only infrequently. The People v. Meyering, 345 Ill 449, 452, 178 NE 80 (1931); Worcester Nat. Bank v. Cheney, 94 Ill 430, 432 (1880).

It is also contended that the defendant was denied his constitutional right to a fair trial by the incompetency of his counsel due to ill health. However, any facts concerning the health of defendant's chosen attor-

141

ney are dehors the record and cannot properly be considered.

The record disclosed that the defendant's defense was that of alibi, and that the testimony of his alibi witness was not convincing. Without factual support, the best of counsel cannot establish a defense to a charge. However, where, as here, the defendant had little or no defense, his counsel may have been inclined to gamble in connection with trial procedures, hoping to find the weakness of the case for the People, and to gain an acquittal thereby. Consequently, a retroactive appraisal of the trial strategy of defense counsel is a futile gesture, absent representation of such low caliber as to require a reversal, or such that the court, by failure to intervene, violates defendant's right to a fair trial.

 In The People v. Stephens, 6 Ill2d 257 (1955), at pages 259 and 260, 128 NE2d 731, the court stated the law on this subject, as follows:

> "Where a defendant in a criminal case employs counsel of his own choice, his judgment of conviction will not be reversed merely because his counsel failed to exercise the greatest skill or for the reason that it might appear, in looking back over the trial, that he had made some tactical blunder. (Citations.) This court has said that ordinarily a defendant who retains counsel of his own selection is responsible if that counsel does not faithfully serve his interests; that any other rule would put a premium upon pretended incompetence of counsel, for if the rule were otherwise a lawyer with a desperate case would have only to neglect it in order to insure reversal or vacation of the conviction. (Citations.) In People v. Reeves, 412 Ill 555, 562, 563, this court quoted with approval the language of Mr. Justice Minton in United States v. Ragen, 166 F2d 976, in which he pointed out that the best of counsel makes mistakes and that his mistakes, although indicative

of lack of skill or even incompetency will not vitiate the trial unless on the whole the representation is of such low caliber as to amount to no representation and to reduce the trial to a farce.

"An examination of the record presented here leads to the conclusion that the most that can be said of the conduct of defense counsel is that he may have made some mistakes, particularly with regard to his failure to interpose objections when some should have been made. Few records examined in the light of sober second sight and calm reflection would fail to reveal situations where it might be said that counsel had not made the most of his opportunities. Human error is easily observed by those having the benefit of the second guess. . . . On the whole record it cannot be said that the representation of defendant was of such low caliber as to require a reversal or that the court, by failing to intervene, violated defendant's right to a fair trial."

We adopt this statement and believe it applies to the situation in the case at bar.

 Defendant also urges that the proof submitted was not sufficient to sustain the verdict of the jury. However, the case was well tried and the jury was properly instructed. It found the evidence of such clear and convincing nature as to establish defendant's guilt of the crime charged beyond all reasonable doubt. From our examination of the record, we find no reason to substitute our judgment for that of the jury. It was within the province of the jury to believe the People's witnesses and to disbelieve the defendant's witness. People v. Nicholson, 55 Ill App2d 361, 370, 204 NE2d 482 (2nd Dist 1965).

 Direct evidence of identification, or of any other fact, is not required. Such facts may be proven, and a conviction may be sustained by circumstantial evidence. The People v. Brown, 27 Ill2d 23, 25, 26, 187 NE2d 728 (1963).

Lastly, the defendant contends that the combined alleged errors, even though imperfectly presented or not properly preserved, deprived him of a fair trial; that under the doctrine of The People v. Coulson, 13 Ill2d 290, 296, 149 NE2d 96 (1958), the evidence in the case is so unsatisfactory as to raise a serious doubt of his guilt; and that under the theory of The People v. Burson, 11 Ill2d 360, 370, 371, 143 NE2d 239 (1957), the alleged errors should all be considered on the merits and the judgment reversed. The frailty of the defendant's argument is that the evidence totally refutes his contention. Factually, this is not a Coulson type case. The errors alleged herein pertained largely to evidentiary and procedural rulings and not to novel, substantial questions, constitutional in nature, as in Burson.

In the case at bar, the evidence—direct and circumstantial—and the inferences therefrom, establish defendant's guilt beyond all reasonable doubt. Consequently, the judgment of the trial court is affirmed.

Judgment affirmed.

MORAN, P. J. and ABRAHAMSON, J., concur.